IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JAMES MOORE,

*Petitioner,*

and

WALTER BABB,

*Petitioner,*

v.

UNITED STATES OF AMERICA,

*Respondent.*

Criminal Case: 04-0190 (AMD)

(Related Cases:
Civil Action No.: 11-cv-1655
and
Civil Action No.: 11-cv-2180)

## MEMORANDUM OPINION

On April 19, 2007, co-defendants James Moore and Walter Babb were convicted by a federal jury of various drug and firearms offenses, including a drug conspiracy that resulted in the shooting deaths of two people (Andre Davis, J., presiding).  Moore was sentenced to life imprisonment plus 35 years, and Babb received a sentence of life imprisonment plus 60 months.

On June 13, 2011, Moore, who is self represented, filed a "Motion To Vacate, Set Aside, Or Correct Sentence By A Person In Federal Custody," pursuant to 28 U.S.C. § 2255 ("Moore Motion," ECF 182), as well as a supporting memorandum ("Moore Memo," ECF 182-1).[1]  On August 5, 2011, Babb, who is also *pro se,* filed a Motion under § 2255 ("Babb Motion," ECF 187), along with a supporting memorandum ("Babb Memo," ECF 187).[2]  In one submission, the

---

[1] Moore submitted the memorandum a second time, on August 5, 2011 (ECF 186).  The "Affidavit Of James Moore," dated June 8, 2011, is appended to the Memo (ECF 182-2).

[2] Because petitioners are proceeding without counsel, their filings have been "'liberally construed'" and are "'held to less stringent standards than formal pleadings drafted by lawyers.'" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citation omitted).

government has opposed both motions, and has submitted several exhibits in support of its position.   *See* "Government's Joint Response To Petitions For Post-Conviction Relief" ("Opposition," ECF 192).  Both Moore and Babb have replied ("Moore Reply," ECF 196; "Babb Reply," ECF 195).

Section 2255(b) mandates hearings for petitions brought thereunder, "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief...."  *See, e.g., United States v. O'Quinn*, 166 F. App'x 697, 698 (4th Cir. 2006) ("Unless it is clear from the record, as expanded, that the prisoner is not entitled to relief, § 2255 makes an evidentiary hearing mandatory.").  For example, "A hearing is required when a movant presents a colorable Sixth Amendment claim showing disputed material facts and a credibility determination is necessary to resolve the issue."  *United States v. Robertson*, 219 F. App'x. 286 (4th Cir. 2007).  In my view, the record in this case conclusively shows that neither Moore nor Babb is entitled to relief.  Therefore, no hearing is necessary.

### Factual and Procedural Background[3]

Moore, who has long been involved in the drug trade, became acquainted with Willie Robinson, Davita Bush,[4] and Barbara Hayes when they all lived in New Rochelle, New York in the 1990's and early 2000's.  Moore Memo at 6.  Bush and Moore sold drugs together there until they moved together to South Carolina in September 2002.  *Id.* at 7.  Robinson supplied drugs for

---

[3] The government's "Statement of Facts" purports to be taken "[f]rom the Government's Appellate Brief," Opposition at 6, and cites liberally to the Joint Appendix submitted on direct appeal.  Similarly, Moore's "Statement Of The Case" purports to be "taken from the record presented on appeal."  Moore Memo at 6 n. 1.  Babb's Memo does not identify the source of his "Relevant Facts."  Babb Memo at 1.  In any event, the facts regarding the underlying criminal trial are not in dispute.  Accordingly, I have drawn the factual account largely from the Moore Memo and the Opposition, and have supplemented them, where noted, with material from the Babb Memo, the record from the trial court, and, occasionally, the trial transcripts.

[4] The spelling of Ms. Bush's first name appears in the record as "Devita" and "Davita."

Moore to sell, *id.*; he also sold drugs himself, as did Babb.  *Id.* at 6.

In August 2003, Moore traveled to El Paso, Texas, to meet a man named Ray Sanchez,[5] from whom he intended to purchase drugs on "consignment."  *Id.* at 7.  He returned home empty-handed, however.  *Id.*  In September 2003, Bush moved to New Jersey.  *Id.*

Moore again traveled to El Paso in October 2003, this time accompanied by Babb, Robinson, and another acquaintance, Alexandria Withers.  *Id.*  The four traveled in a black Dodge Intrepid (the "Intrepid"), *id.*, which was titled in Hayes's name.  *Id.* at 8.  However, Robinson had assumed responsibility for car payments and the vehicle was in his possession.  *Id.*

Babb's girlfriend, Porsha Harper,[6] stayed behind at Babb's home in Greensboro, North Carolina, to "house-sit."  *Id.* at 7.  Babb called Harper to tell her the four had encountered some difficulties.  *Id.* at 8.  Robinson called Hayes, with whom he had children, to tell her that the Intrepid had broken down.  *Id.*  Moore also called Bush from Texas, using phones belonging to Withers and Babb, and told her that the purpose of the trip was to pursue a drug connection with Sanchez.  *Id.*

The second trip to El Paso was fruitful; Sanchez arranged for the shipment of drugs to North Carolina, where Moore informed Bush he would next travel.  *Id.* at 8-9.  Moore, Babb, Robinson, and Withers returned to North Carolina in late October 2003.  *Id.* at 9.  Moore stayed with Babb while in Greensboro.  *Id.*  Babb told Bush that Moore was upset with Robinson regarding a monetary dispute.  *Id.*  Then, on or about November 5, 2003, Harper agreed to drive Moore to New York.  *Id.* at 10.  In the early morning hours of November 6, 2003, at approximately 1:20 a.m., Moore, Babb, and another man, Anthony McCormick, arrived at

---

[5] The spelling of Mr. Sanchez's first name appears in the record as "Ray" and "Rey."

[6] Porsha Harper, a co-defendant, pleaded guilty on November 9, 2006, to obstruction of justice.  At trial, she testified for the government.

3

Harper's home.  *Id*.  The men were driving two vehicles, one of which was the Intrepid.  *Id*.  Harper and Moore left in the Intrepid, with Harper in the driver's seat; Babb and McCormick left in the other car.  *Id*.

On the way to New York, Moore told Harper that there was $300,000 of drug-related money in the Intrepid.  *Id*.  He also gave Harper $2,000 in cash, which Harper stored in her boot.  *Id*.  Moore took over driving the vehicle after they passed through Washington, D.C.  *Id*.  At approximately 10:30 a.m. on November 6, 2003, Jacob Cameron, a Maryland State Trooper, stopped the Intrepid in Cecil County, Maryland, for speeding.  *Id*.  Harper showed the officer her identification card, and an insurance card in Hayes's name.  *Id*. at 11.  Moore could not produce a driver's license, however.  *Id*.  The officer patted Moore down after noticing a bulge in one of his pockets, and discovered approximately $1,000 in Moore's pocket.  Opposition at 7.[7]  The officer was suspicious because of the cash; discrepancies in statements by Moore and Harper regarding Moore's name, their destination, and ownership of the Intrepid; and the rear end of the vehicle was unusually low.  *Id*.  The trooper called for backup, and two additional officers responded.  Moore Memo at 10.

Trooper Cameron continued to speak with Harper, who appeared shaken.  *Id*.  He commented on the amount of clothing on the back seat of the Intrepid, *id.*, and on the unusually low rear end of the vehicle.  Opposition at 7.  Harper asked him if he wanted to look in the trunk, and the officer answered in the affirmative.  *Id.*; Moore Memo at 10.  Harper then opened the trunk, revealing two corpses.  *Id*.  The bodies were later identified as those of Robinson and Withers, both of whom had both been shot to death.  *Id*. at 12.  Each was wrapped in a comforter, plastic bags, and a shower curtain liner.  *Id*.  It was subsequently determined that the shootings

---

[7] It is not clear whether he also patted down Harper.

had occurred at Babb's residence in Greensboro, North Carolina on November 5, 2003. Opposition at 2. Harper later testified at trial that the comforter and shower curtain belonged to Babb. Moore Memo at 13.

Harper and Moore were taken into custody at the scene. Moore Memo at 11. In a search of Moore incident to arrest, a substantial amount of cash was recovered, along with a $300 money order from Greensboro, North Carolina payable to Bush, and a blood-stained piece of paper with Babb's phone number on it. *Id*. at 11-12; Opposition at 10. Some of the cash also appeared to be bloodstained. Moore Memo at 12. Moore informed the officers that there was over $100,000 in cash inside a duffel bag in the Intrepid. *Id*. After waiving his *Miranda* rights, Moore explained that he was "running drugs" for Sanchez. Opposition at 8-9 (quoting JA-I:169).

Several items were recovered from the Intrepid, including shell casings, a shirt stained with Robinson's blood, a map to El Paso, a woman's boot containing $2,000, a calendar with Babb's phone number written on it, and a pen inscribed with the name of Sanchez's El Paso auto-repair business. Moore Memo at 12-13. Fingerprints were lifted from the plastic bags wrapped around the bodies of Withers and Robinson, and were found to match Moore's. *Id*. at 12. Moore's fingerprints were also found on a trash bag recovered from the trunk, and on money wrappers found inside the vehicle. *Id*. Babb's fingerprints were not recovered, however. *Id*.

Bush testified at trial that, after Moore's arrest, she was party to several "three way" phone calls between Babb and Moore. *Id*. at 13. She forwarded several calls to Babb from Moore, who was incarcerated. *Id*. at 14. Moore told Bush that Babb would give her money while Moore was in jail. *Id*. at 13. Babb provided Bush with sums of money, including a lump payment of $10,000. *Id*. at 14. Eventually, the payments ceased, with Babb explaining to Bush

that scrutiny from law enforcement authorities related to the investigation of Moore had limited his abilities to obtain money from the drug trade. *Id.* Bush traveled to Greensboro to meet Babb. *Id.* At Babb's home,[8] Babb gave Bush 200 grams of crack cocaine to take to New York to sell. *Id.* Instead, Bush went to Maryland, where she sold some of the drugs and used the rest. *Id.* Apparently, while in Maryland, Bush learned that she was under investigation and fled to New York, where she was arrested on July 14, 2004. *Id.* at 15.

Babb was arrested in Greensboro on August 16, 2004. *Id.* Two days later, officers executed a search warrant at his home and discovered two assault rifles, a Glock pistol, a scale, some pills of Ecstasy, and an identification card for Babb. *Id.*

Babb, Moore, and Harper were indicted on April 7, 2004. *See* ECF 1. Superseding indictments were returned on August 11, 2004; September 1, 2004; and April 6, 2006. *See* ECF 10, 24, 106. At trial, which commenced on April 2, 2007, the government proceeded on the following charges against Moore and Babb: conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine and fifty grams or more of cocaine base, in violation of 21 U.S.C. § 846 (Count One); conspiracy to possess firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(o) (Count Two); use of a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Counts Three and Four, regarding the shootings of Robinson and Withers); use of a firearm to commit murder during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(i) (Counts Five and Six); and possession of firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Count Seven).

---

[8] In his Memo, Moore states that they went to the home of Babb's girlfriend, "Tonya Martin." In its Opposition, the Government states that Babb had a second home on "Martin Avenue." The reasons for this discrepancy are not clear, but are not material. I will refer to this residence as Babb's home.

Counts Five and Six were dismissed prior to submission to the jury.  Opposition at 2.  On April 19, 2007, the jury convicted Moore of Counts One, Two, Three, Four, and Seven, ECF 135, while Babb was convicted of Counts One, Two, and Seven.  *Id*.  As to Babb, the jury was unable to reach a verdict as to Counts Three and Four, and a mistrial was declared as to him on those counts.  *Id*.  Babb was not re-tried as to Counts Three and Four.

Moore was subsequently sentenced to life in prison as to Count One; a period of 240 months' incarceration as to Count Two, concurrent with Count One; 120 months as to Count Three, consecutive to Count One; 120 months as to Count Four, consecutive to Count Three; and 300 months as to Count Seven, consecutive to Counts One and Three, for a total term of "life plus 35 years."  ECF 142.  Babb was sentenced to life in prison as to Count One; 20 years' imprisonment as to Count Two, concurrent with Count One; and 60 months' imprisonment as to Count Seven, consecutive as to Count One, for a total term of "life plus 60 months."  ECF 143.

Both Babb and Moore filed timely notices of appeal (ECF 144, 145).  Their appeals were consolidated (ECF 148) and, on March 15, 2010, their convictions and sentences were affirmed (ECF 178).  Moore did not file a petition for certiorari to the United States Supreme Court. Moore Motion at 2.  Babb's petition for certiorari was denied on October 4, 2010.  *United States v. Babb,* 131 S.Ct. 193 (2010).

As noted, Moore filed his § 2255 petition (ECF 182) on June 13, 2011, and Babb filed his § 2255 petition (ECF 187) on August 5, 2011.  The government does not contest the timeliness of the petitions.  In their respective petitions, Moore and Babb challenge their convictions, based on various claims of ineffective assistance of counsel.  They also challenge their sentences.

Additional facts are included in the discussion of the issues.

**Discussion**

Pursuant to 28 U.S.C. § 2255(a), a prisoner in federal custody may "move the court which imposed the sentence to vacate, set aside or correct the sentence" if the prisoner can show

> that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack….

To challenge successfully a conviction under § 2255 based on a Sixth Amendment claim of ineffective assistance of counsel, as Moore and Babb attempt to do here, a petitioner must satisfy the two-prong test set forth in the seminal case of *Strickland v. Washington,* 466 U.S. 668 (1984). *See, e.g., United States v. Higgs*, 663 F.3d 726, 735 (4th Cir. 2011) ("To succeed on a Sixth Amendment claim of ineffective assistance of counsel, the defendant must satisfy the two-prong test set forth in *Strickland.*"). *See also Richardson v. Branker*, 668 F.3d 128 (4th Cir. 2012) (same). First, the petitioner must show that his attorney's performance was "below an objective standard of reasonableness," measured by "prevailing professional norms." *Strickland,* 466 U.S. at 688. This is known as the "performance prong" of the test. Second, the petitioner must show that his attorney's deficient performance "prejudiced [his] defense." *Id*. at 687. To satisfy the "prejudice prong," a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694, or that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. However, a court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id*. at 697.

"Keenly aware of the difficulties inherent in evaluating counsel's performance, the Supreme Court has admonished that courts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Lawrence v.*

*Branker*, 517 F.3d 700, 708 (4th Cir. 2008) (quoting *Strickland,* 446 U.S. at 689).   Indeed, the Fourth Circuit has suggested that the first *Strickland* prong is "difficult" to establish.   *James v. Harrison,* 389 F. 3d 450, 457 (4th Cir. 2004).   And, there can be no post-conviction relief based on attorney error where the record establishes that it is "not reasonably likely that [the alleged error] would have made any difference in light of all the other evidence of guilt."   *Berghuis v. Thompkins*, ___ U.S. ___, 130 S.Ct. 2250, 2265 (2010).

*Moore*

## I.   Statutory Speedy Trial Right

Asserting that he was incarcerated for 1,574 days before his trial, Moore Memo at 22, Moore argues that his attorney's performance was deficient because, even accounting for "numerous motions" filed by Moore's attorneys that "tolled the 70-day [speedy trial] clock," defense counsel failed to argue that Moore's trial did not begin within seventy days of his indictment or initial appearance, as required by the Speedy Trial Act ("STA"), 18 U.S.C. § 3161. Moore Memo at 16, 20.   Moore calculates that, out of the "1574 days [he was] incarcerated prior to the start of his trial[,] less than 270 days were properly excludable."   *Id.* at 22.[9]   In his view, had his counsel raised a challenge under the STA, "there is more than a reasonable probability that Mr. Moore's charges would have been dismissed."   *Id.* at 23.

The government acknowledges that, if there is a violation of the STA, "upon counsel's motion, the indictment must be dismissed."   Opposition at 33.   But, it maintains that "the trial court has the discretion to determine whether the dismissal is with or without prejudice."   *Id.   See* 18 U.S.C. § 3162(a)(2).   Noting that "[n]either type of dismissal is 'the presumptive remedy for a Speedy Trial Act violation,'" Opposition at 33 (quoting *United States v. Taylor*, 487 U.S. 326,

---

[9] As discussed, *infra*, the government disputes Moore's calculation of the relevant length of his pretrial detention and his calculation of non-excludable days.

334 (1988)), the government insists that, at most, the applicable factors would have resulted in a

dismissal without prejudice.   Opposition at 37-38.   And, given the overwhelming evidence

against Moore, the government contends the outcome of the case would not have been affected.

*Id*. at 38.   Therefore, it argues that Moore cannot establish the *Strickland* "prejudice prong"

based on his attorney's failure to raise an STA violation.   *Id.*

It is by no means clear from the record that there was an STA violation.   The "clock"

began to run for Moore and Babb on September 8, 2004, when, according to the docketing sheet,

the last defendant, Babb, made his initial appearance.   *See* 18 U.S.C. § 3161(h)(7).   However, the

time during the pendency of a motion is excludable under 18 U.S.C. § 3161(h)(1)(F).   The

Fourth Circuit has explained:

> In computing the time within which a defendant's trial must commence, the [STA]
> excludes…any period of 'delay resulting from any pretrial motion, from the filing
> of the motion through the conclusion of the hearing on, or other prompt
> disposition of, such motion.'   18 U.S.C. § 3161(h)(1)(F)….This period is
> automatically excludable; *delay in resolving outstanding pretrial motions need
> not be reasonable for this period to be excluded from the Speedy Trial Act
> calculation*.

*United States v. Osteen*, 254 F.3d 521, 525 (4th Cir. 2001) (emphasis added) (citation omitted).

Moreover, "[i]n a case involving several defendants, time excludable for one defendant is

excludable for all defendants."   *United States v. Jarrell,* 147 F.3d 315, 319 (4th Cir. 1998).

Here, tolling began with the filing on September 28, 2004 (ECF 34) of the government's

"Motion to Exclude Time from Speedy Trial Computation by USA as to James Moore, et al,"

which was granted on September 29, 2004 (ECF 35).   Pursuant to ECF 35, the speedy trial clock

was tolled until "such time as the Attorney General for the United States decides whether the

United States [would] file notice of its intent to seek the death penalty…."   It was not until

October 25, 2005, that the government advised the court that it would not seek the death penalty.

Opposition at 36.[10]   Thereafter, a number of pretrial motions were filed by the three defendants, some of which were not resolved until trial.

Even if, *arguendo*, there had been a STA violation, Moore cannot show that, had his attorney objected, his case would have been dismissed, with prejudice.   The factors to be considered by a court in determining whether to dismiss a case with or without prejudice are enumerated in 18 U.S.C. § 3162(a)(2), and are as follows:

> the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of [the STA] and on the administration of justice.

Further, "prejudice to the defendant" is a "factor…relevant for a district court's consideration," although it is not enumerated in the statute and cannot be dispositive.  *Taylor,* 487 U.S. at 334.  *See also United States v. Thomas*, 305 F. App'x 960, 963 (4th Cir. 2009).

In *Thomas,* the § 2255 petitioner asserted that "his trial attorney was ineffective for failing to move to dismiss the indictment pending against him because of a violation of the Speedy Trial Act and [petitioner's] Sixth Amendment right to a speedy trial."  305 F. App'x at 961.   Approximately one year passed between petitioner's initial appearance and the commencement of his trial, and petitioner asserted, after accounting for tolling, that the government had "exceeded by twenty-three days the seventy-day period allotted by the [STA]," and that petitioner was "prejudiced by this delay because, prior to commencement of his trial, his co-defendant…died, and was unavailable to provide what Thomas asserted would be exculpatory testimony."  *Id.* at 962.  In affirming the district court's denial of petitioner's motion, the Fourth Circuit concluded that "the length of delay, the seriousness of the narcotics and firearm charges,

---

[10] In its Opposition, the government avers: "[T]he death penalty was NOT authorized, as the court and counsel were advised by letter dated October 25, 2005."  *Id.* at 36.  Moore does not dispute this assertion.  However, I was unable to locate the letter of October 25, 2005, in the voluminous record.

and the lack of evidence of prosecutorial neglect or misconduct causing the delay would have, at most, resulted in a dismissal without prejudice." *Id.* at 964.

So too with Moore.  The STA was fashioned as a "deterrent."  *Taylor*, 487 U.S. at 342.  Although "[i]t is self-evident that dismissal with prejudice always sends a stronger message than dismissal without prejudice," the STA "does not require dismissal with prejudice for every violation."  *Id.*  Moreover, there is no evidence of conduct that the trial court reasonably could have found justified a dismissal with prejudice, particularly in light of the overwhelming evidence against Moore.

Turning to the factors articulated in 18 U.S.C. § 3162(a)(2) and *Taylor*, described *supra*, I am satisfied that, if Moore's attorney had noted a STA violation, the outcome of Moore's case would have been no different.  "[A]t most, [it would have] resulted in a dismissal without prejudice," *Thomas,* F. App'x at 964, and, in light of the serious nature of the charged offenses, the government surely would have sought to reprosecute.

In sum, Moore's claim of ineffective assistance of counsel with respect to his attorney's failure to invoke Moore's statutory right to a speedy trial cannot suffice as grounds on which to attack his conviction.  Moore stood accused of serious offenses, having been implicated in drug trafficking and a double homicide.  There was no evidence of "prosecutorial neglect or misconduct."  *Thomas,* 305 F. App'x at 964.  The delay in bringing Moore to trial resulted from consideration by the government as to whether to seek the death penalty, the filing of numerous defense motions, and the need for the parties to prepare for a complex case involving three co-defendants and numerous witnesses from several states.

In addition, there was substantial physical evidence uncovered at the scene of Moore's arrest; Moore made incriminating comments at the time of his arrest; and, as the government

notes, the "cooperation of the key witnesses against Moore," including Bush, "was obtained prior to Moore's initial indictment."  Opposition at 38.  The delay did not, then, improperly enable the government to build a stronger case, as Moore suggests, any more than Moore benefitted from the time to build a defense.  Nor has Moore alleged "prejudice to [his] trial preparation," or shown that there were "any additional restrictions or burdens on his liberty as a result of the speedy trial violation," as the overwhelming evidence against him dictated against pretrial release, and resulted in his conviction.  *Taylor*, 487 U.S. at 341.

II.     Sixth Amendment Speedy Trial Right

Moore also argues that his attorney's performance was deficient in that he failed to argue that Moore's "Sixth Amendment right to a speedy and public trial" was violated.  Moore Memo at 23.  According to Moore, this "was a straightforward case regarding the question of whether or not Mr. Moore conspired with others to commit murder or traffic drugs.  As such, there was certainly nothing complex about this case" so as to justify the delay.  *Id.* at 25.  Yet, noting that forty-three months elapsed between his arrest by the State of Maryland on November 6, 2003, and the start of the federal trial on April 2, 2007, Moore claims that the delay is presumptively prejudicial.  *Id.* at 24.  Further, Moore contends that "the delays were caused by the government, not by the Petitioner," and that the government lacked good cause for the delay.  *Id.* at 25.

Moore concedes that he did not assert his right to a speedy trial, but insists that "fault lies solely on [his] counsel," who did not "inform [Moore] of either his statutory or constitutional right to a speedy trial."  *Id.* at 26.  Moore maintains that, had he "been aware of these rights, he would have insisted on asserting his right[s], and insisted on filing a motion to dismiss based on these violations."  *Id.*

The government disputes Moore's assertion of a forty-three month delay, arguing that the Sixth Amendment speedy trial "clock" does not commence until the defendant is taken into federal custody or is the subject of a federal indictment. Opposition at 39. As noted, Moore was arrested by Maryland state law enforcement on November 6, 2003, but was not indicted by the federal government until April 7, 2004. "The period between [a petitioner's] state arrest and federal indictment is irrelevant for a Sixth Amendment inquiry." *United States v. Lockwood*, 30 F.3d 132, *1 (4th Cir. 1994). *See also United States v. Harris*, No. 11–0187, 2011 WL 2413771, *3 (D. Md. June 08, 2011) ("The initiation of federal charges triggers the Sixth Amendment protections; a previous state arrest does not trigger constitutional speedy trial protections for a later federal charge.").

Nevertheless, the government concedes that the delay between the indictment in April 2004 and the trial in April 2007 is presumptively prejudicial. But, it argues that Moore cannot establish a Sixth Amendment violation under *Barker v. Wingo*, 407 U.S. 514 (1972).

In *Barker*, the Supreme Court stated that, "in determining whether a particular defendant has been deprived of his right" to a speedy trial, four factors should be considered: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.* at 530. "A one year delay is generally treated as presumptively prejudicial." *United States v. Shealey*, 641 F.3d 627, 634 (4th Cir. 2011). However, such a delay does not conclusively establish a Sixth Amendment violation. *See, e.g., United States v. Woolfolk*, 399 F.3d 590, 598 (4th Cir. 2005) ("Although [petitioner] has satisfied the threshold requirement [by noting a delay of nearly one year], that fact by no means ends our *Barker* inquiry. We have previously found no Sixth Amendment violation in cases involving time periods much greater than that at issue here. *See United States v. Grimmond,* 137 F.3d 823, 827 (4th Cir.1998) (thirty-

five months); *[United States v.] Thomas,* 55 F.3d [144,] 149-150 [(4th Cir. 1995)] (two and a half years)").

Examination of the remaining *Barker* factors leads to the conclusion that, had Moore's attorney asserted a violation of Moore's Sixth Amendment right, he would have been unsuccessful.  The second factor involves "the reason for the delay," *Barker,* 407 U.S. at 530, which is characterized as "valid," "improper," or "neutral."  *Grimmond, supra,* 137 F.3d at 828. Each "class" of reasons carries different weight.  For example, improper reasons for delay, like harassment, are to be "weighted heavily against the government."  *Id.* (citing *Barker,* 407 U.S. at 531 (also classifying the government's deliberate attempts to delay as "improper")).  Valid reasons, such as a missing witness, are to be "weighted in favor of the Government."  *Id.*  And, with respect to neutral reasons, such as an understaffed prosecutor's office, "'the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.'"  *Id.* (citing *Barker,* 407 U.S. at 531 ("A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant."); *Strunk v. United States*, 412 U.S. 434, 436 (1973) ("Unintentional delays caused by overcrowded court dockets or understaffed prosecutors are among the factors to be weighed less heavily than intentional delay, calculated to hamper the defense, in determining whether the Sixth Amendment has been violated….")).

There is no evidence here of improper purpose with respect to the delay.  Although Moore asserts that "the delays were caused by the government, not by the Petitioner," Moore Memo at 25, this statement does not account for the numerous pretrial motions filed by the defendants.  And, although Moore characterizes this case as "a straightforward case regarding

the question of whether or not Mr. Moore conspired with others to commit murder or traffic drugs," *id.,* this statement reflects a misapprehension of the complexity of the case.  As the government observes:

> The prosecution was complicated, involving serious, complex conspiracy and murder charges that implicated multiple parties in several jurisdictions.  The evidence included forensic evidence such as DNA, fingerprints, and ballistic/firearm comparison for which some of the examination took months to prepare before they could be provided to the defense, who then filed motions seeking to suppress that evidence….The discovery upon which these motions were based consisted of thousands of pages of police reports and grand jury materials, four large boxes of phone records and several binders of Penlink analysis of the phone records.  In all the discovery provided by the government entailed more than 32 separate submissions.  Both the government and defense teams…also made several trips to North Carolina and other locations involved in the offense….The issue of venue alone involved several motions and responses and a separate hearing that was held on April 18, 2006.

Opposition at 42-43 (citations omitted).  It is clear that "[t]his was not a simple case, factually or legally."  *Id.* at 43.  Because the delays were justified, the second *Barker* favor tilts against petitioner.

With respect to the third factor, "the defendant's assertion of his right," *Barker,* 407 U.S. at 530, it is undisputed that Moore never asserted his speedy trial right.  This is, of course, of little import, as Moore is here asserting that his failure to assert this right was due to ineffective assistance of counsel, itself a Sixth Amendment violation.  However, in light of the circumstances herein recounted, it is far from apparent that attorney error, rather than deliberate (and wise) choice, was responsible.

The fourth factor, "prejudice to the defendant," *Barker,* 407 U.S. at 530, is of great import. *See, e.g., United States v. Brown*, 292 F. App'x 250, *2-3 (4th Cir. 2008) (affirming the district court's denial of petitioner's speedy trial claim although "the first three factors of the [*Barker*] test weigh[ed] in [his] favor" because he could not "demonstrate that he ha[d] suffered

prejudice from the delay").  The Supreme Court has stated that prejudice "should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect," and has identified three such interests: the prevention of oppressive pretrial incarceration; the minimization of anxiety and concern of the accused, and the limitation of the possibility that the defense would be impaired.  *Barker,* 407 U.S. at 532.

Moore has not alleged any prejudice resulting from the delay.  Although Moore's pretrial detention was lengthy, it is comparable to delays for which no Sixth Amendment violation was found.  *See, e.g., Grimmond*, 137 F.3d at 827 (thirty-five months); *Themes*, 55 F.3d at 149-50 (thirty months).  Undoubtedly, Moore experienced anxiety and concern during the pendency of the proceedings, but "[a]nxiety alone over case status is not sufficient to find that there was prejudice affecting [his] substantial rights."  *Brown,* 292 F. App'x at *3.

The prospect of impairment of a detainee's defense, as a result of detention, has been described by the Supreme Court as "the most serious" factor, because "the inability of a defendant adequately to prepare his case skews the fairness of the entire system."  *Barker,* 407 U.S. at 532.  Yet, as the government notes in its Opposition, at 46:

> Moore is unable to point to any evidence that his defense was impaired in any way.  Nor has Moore identified any witnesses that were unavailable as a result of the delay or any that were unable to accurately recall the relevant events.  He does not contend that exculpatory evidence was lost, nor has he identified any evidence that was rendered unavailable by the delay.

After careful consideration of the four *Barker* factors, I am satisfied that, had Moore's attorney made a speedy trial motion based on the Constitution, he would not have been successful.  Therefore, Moore's claim of ineffective assistance of counsel with respect to his attorney's failure to invoke Moore's constitutional right to a speedy trial must fail.

III.    <u>Decision To Proceed To Trial</u>

Moore notes that his attorney "informed [him] prior to trial that the government had offered a plea agreement," pursuant to which he would be "required…to admit to murder and to accept a mandatory life sentence, and that the government would not agree to any other plea." Moore Memo at 28.   However, Moore asserts that his attorney's performance was deficient, in that counsel failed to notify plaintiff of another plea bargain offered by the government. Pursuant to this undisclosed "deal," Moore claims he would have received "a 10-year sentence," rather than "life plus 35 years."  *Id.* at 30.  And, Moore maintains that, if he had been informed of the plea offer, he would have accepted it.  *Id*. at 29.  Moore explains, *id.*:

> [He] has learned that the government would have been agreeable to a plea of guilty to the drug conspiracy charge, and that his sentence would not have been a mandatory life sentence.  Further, Petitioner learned that he could have received a further reduction if he provided substantial assistance.

The government disputes that Moore ever faced a "mandatory life sentence," noting that "[t]he *maximum* sentence for several of the counts of conviction was life, but the life sentence for Count One that was imposed by Judge Davis was discretionary, not mandatory."  Opposition at 46 (emphasis in original).  The government also denies the existence of a second, undisclosed "deal" stating: "[T]he undersigned, lead government counsel at trial[,] would have been the one making such an offer, and no plea offer was ever made to Moore."  *Id.* at 47.  With respect to the potential for "a further reduction if [Moore] provided substantial assistance," the government avers that Moore knew Harper benefitted from cooperation, and "cannot seriously assert that he was unaware of that option and, like Harper, he could certainly have explored it.  Instead, Moore unwisely insisted on going to trial with Babb."  *Id.*

Notably, "the negotiation of a plea bargain is a critical phase of litigation for purposes of the Sixth Amendment right to effective assistance of counsel."  *Padilla v. Kentucky*, 559 U.S.

___, 130 S. Ct. 1473, 1486 (2010).  In the recent case of *Missouri v. Frye,* 566 U.S. ___, No. 10-444, 2012 WL 932020, *8 (Mar. 21, 2012), the Supreme Court said: "[A]s a general rule, defense counsel has the duty to communicate formal [plea] offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused."  If an attorney allows such an offer "to expire without advising the defendant or allowing him to consider it, defense counsel d[oes] not render the effective assistance the Constitution requires."  *Id*.

Claims of ineffective assistance of counsel with respect to plea bargains are governed by the two-part test articulated in *Strickland*, 466 U.S. 668.  *See Hill v. Lockhart*, 474 U.S. 52, 57 (1985).  In its recent decision in *Frye*, the Supreme Court explained, *id*. at *9:

> To show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel.  Defendants must also demonstrate a reasonable probability the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it, if they had the authority to exercise that discretion under state law.  To establish prejudice in this instance, it is necessary to show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time.

*See also Lafler v. Cooper*, 566 U.S. ___, No. 10-209, 2012 WL 932019, *5 (Mar. 21, 2012).

Here, Moore merely asserts that he "has learned" that the government proposed a ten-year "deal," but his lawyer failed to notify him of it.  Yet, the party who would have been responsible for offering such a deal has flatly denied that any such plea offer was made.  Moreover, it strains credulity to believe that such a minimal sentence would have been offered to a person implicated in drug trafficking and a double homicide.  It also strains credulity to believe that Moore was unaware that cooperation would work to his benefit.

Moreover, Moore has not advanced any evidence to support his claim that such a deal was proposed to his attorney, but not communicated to him.  Nor is his assertion in any way

particularized.  For example, he does not state who told him of the plea offer.  Moore cannot successfully attack his conviction on the ground that his attorney's performance was constitutionally ineffective in not communicating a plea "deal," the existence of which is not supported by a scintilla of evidence.

IV.   Venue

Moore argues that his attorney's performance was deficient in that defense counsel failed to argue that venue was improper as to Counts Three and Four, which charged Moore with use of a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (regarding the shooting deaths of Robinson and Withers).  Moore Memo at 32.  He asserts, *id.* at 33, that the deaths of Robinson and Withers

> occurred in North Carolina and not in Maryland.  While the transportation of bodies may have been an overt act of an alleged conspiracy to commit murder, the alleged 'carrying' and 'discharge' occurred long before Mr. Moore entered Maryland.  As such, venue was not proper in Maryland.

According to Moore, had his attorney raised this challenge, Counts Three and Four "would have been dismissed."  *Id.*

Moore concedes that his attorney unsuccessfully argued in the District Court that venue was not proper as to Count Seven, possession of firearms in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c), and the Fourth Circuit affirmed the trial court.  *Id*. at 32. Similarly, the government observes that although Moore did not challenge venue as to Counts Three and Four, Babb did so, and was unsuccessful.  Opposition at 47-48.  Moreover, Judge Davis "found that venue for all of the Section 924(c) counts existed in Maryland because venue for the underlying drug trafficking conspiracy existed in Maryland."  *Id.* at 48.[11]

---

[11] As noted, as to Babb, the jury deadlocked as to Counts 3 and 4.  Therefore, it does not appear that Babb challenged the venue ruling on appeal.

The docket reflects that, on May 25, 2006, Judge Davis denied defendants' motions to dismiss for improper venue.  *See* ECF 107.  And, on appeal, the Fourth Circuit held, with respect to Count Seven (regarding possession of firearms in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)):

> Venue was proper in Maryland because an overt act of the drug conspiracy, the carrying of money and bodies into the state on Interstate 95, occurred there. Therefore,…venue for the section 924(c) counts is proper as well because those charges could be brought in any district in which the underlying drug offense had venue.

*United States v. Babb*, 369 F. App'x 503, 510 (4th Cir. 2010).

The Supreme Court has stated that, "where venue is appropriate for the underlying crime [of violence or drug trafficking], so too it is for the § 924(c)(1) offense."  *Rodriguez-Moreno*, 526 U.S. 275, 282 (1999).  *See also United States v. Robinson,* 275 F.3d 371, 378-79 (4th Cir. 2001).  It follows that Moore's attorney did not err.

V.      Post-Arrest Statements

Moore argues that his attorney's performance was deficient because he failed to seek suppression of incriminating statements that Moore made to law enforcement officers after his arrest.  According to Moore "officers of the Maryland State Police physically assaulted [him] in an attempt to get him to confess to a crime he did not commit, i.e., the murder[s] of [Mr.] Robinson and Ms. Withers."  Moore Memo at 34.  Moore maintains that he "admitted that he was a drug carrier and that he was transporting money for the purchase of drugs" only "[a]fter being struck several times in the face and on his head, and after being shoved and verbally threatened."  *Id*.  In addition, Moore claims that, "[p]rior to and during trial," he told his attorney about the incident, but was informed "that no one would believe him and that it would only make the Court mad to accuse the officers."  *Id*.  He asserts: "Without question, had [his] attorneys

properly argued that his statements should be suppressed as involuntary and the result of physical coercion, there is a reasonable probability that the motion would have been granted." *Id.* at 35. Moore adds: "[W]ithout those statements[,] there is a reasonable probability that the jury would have acquitted [him] of conspiring to distribute drugs." *Id.*

The government points out that Moore's attorney did, in fact, move to suppress Moore's post-arrest statements, but was unsuccessful. Opposition at 49. The government also denies the truth of Moore's accusations as to police misconduct, stating, *id.* at 50:

> Moore testified on his own behalf at the suppression hearing—and had every opportunity to tell the court about the alleged coercive police conduct. He said nothing at all like that. Instead, Moore gave an incredible account of how he came to be in the Intrepid in which the bodies were found that was so outrageous that Judge Davis found Moore to be completely incredible.

Further, the government argues that, even if the disputed statements had been suppressed, the remaining evidence against Moore was overwhelming. Therefore, Moore cannot show that, had his attorney "properly" challenged the voluntariness of his statements, "it was reasonably likely that…without that evidence, he would have been acquitted…." *Id.*

A review of Moore's "Motion To Suppress Statements[,] Admissions And Confessions" (ECF 100), dated January 24, 2006, reveals that Moore asserted that his statements were obtained in violation of *Miranda* and were made involuntarily. However, the motion did not specify why the statements were "involuntary."

Judge Davis held a motion hearing on September 15, 2006, at which he heard evidence and arguments regarding the motion to suppress. The record contains a copy of the "*Miranda* waiver" signed by Moore on November 6, 2003. Moore was one of several witnesses at the hearing. In his testimony, he did not allege that the police used violence against him. Rather, he claimed that he was questioned *after* requesting an attorney. For example, Moore stated: "…I

told [the officer] from the beginning that I didn't want to talk, that I wanted a lawyer.  But he kept badgering me, so I just told him whatever he wanted, whatever came to mind."  Transcript of September 15, 2006, at 39:12-14.   The government's witnesses flatly disputed Moore's account.  They testified that Moore was promptly advised of his *Miranda* rights, and that all questioning ceased immediately when Moore invoked his right to counsel.  *See, e.g.,* Testimony of Sergeant Jack McCauley, *id.*, 114:11-117:4; 134:11-135:10.  Judge Davis denied the motion in an oral opinion rendered from the bench, in which he apparently credited the testimony of the government's witnesses.[12]  *See* docket entry of September 15, 2006.

I am satisfied that, on the basis of Moore's motion to suppress (ECF 100), there was no attorney error.  Even if there was error, however, it was not prejudicial, because the evidence of Moore's culpability, separate and apart from his statements to the police, was overwhelming.  The evidence found in the Intrepid alone was substantial, including the large denominations of bloodstained currency with Moore's fingerprints on the wrappers, Moore's fingerprints on the bags wrapping the bodies, and the evidence of the trip to see Sanchez in El Paso, which was also confirmed by phone records.  Moreover, the government had several key witnesses who cooperated and testified, including Harper and Bush.

There can be no post-conviction relief based on attorney error where the record establishes that it is "not reasonably likely that [the alleged error] would have made any

---

[12] According to the government, Moore's testimony was "completely incredible."  For example, Moore testified he made the second trip to El Paso with Robinson and "two females," but could not name or recognize photographs of the "females," one of whom, Withers, later was found dead in the trunk of the vehicle Moore was driving.  Testimony of James Moore, *id.,* 14:17-23.  Moore also denied making the incriminating statements that were the subject of his challenge, *id.* at 18:27-25; stated that he hired Harper to drive him to New York after having met her in a candy store, not knowing at the time that she and Babb were acquainted, *id.* at 28:5-29:2; and claimed he earned the sum paid to Harper for the ride to New York by selling clothes, yet could not identify a single person to whom he had sold clothing.  *Id.* at 31:18-32:8.

difference in light of all the other evidence of guilt." *Berghuis*, *supra*, 130 S.Ct. at 2265.  I

readily conclude that Moore cannot sustain his collateral attack on his conviction on the ground

that his attorney was deficient in failing to argue that Moore's statements were the product of

police coercion.

VI.    Reasonable Doubt Instruction

Moore contends that his attorney's performance was deficient in that he failed to

"properly" argue "that the Court was required to give an instruction [to the jury] on 'reasonable

doubt.'"  Moore Memo at 36.[13]  The government counters that "the Fourth Circuit has repeatedly

cautioned that courts are *not* to give a reasonable doubt instruction."  Opposition at 53 (emphasis

in original).

The government is correct.  Indeed, the Fourth Circuit addressed this issue in its opinion

in this case on direct appeal, and said:

> This Court held in *United States v. Oriakhi,* that no reasonable doubt instruction is
> constitutionally required, unless the jury requests it.  57 F.3d 1290, 1300 (4th
> Cir.1995).  Further, the Supreme Court held in *Victor v. Nebraska* that "the
> Constitution neither prohibits trial courts from defining reasonable doubt nor
> requires them to do so as a matter of course."  511 U.S. 1, 5 (1994).  There has
> been no subsequent decision which would lead this Court to rethink its precedent
> that "the words 'beyond a reasonable doubt' have the meaning generally
> understood for them and that further efforts to restate their meaning with different
> words tend either to alter or to obfuscate that meaning."  *Oriakhi,* 57 F.3d at 1300.

*Babb*, 369 F.App'x at 508-09.

Precedent could scarcely be more clear.  Moore was not entitled to a jury instruction as to

reasonable doubt.  Therefore, his attorney did not err.

---

[13] Moore acknowledges that his attorney made such an argument, but claims he did not
do so "properly," because the Court "denied counsel's request, and the Court of Appeals
affirmed that decision."  *Id.*

VII.    <u>Cautionary Instruction</u>

Moore argues that his attorney's performance was deficient in that he did not request a jury instruction about the heightened scrutiny applicable to the testimony of witnesses who cooperate with the government.  Moore Memo at 39.  He insists that, "had the instruction been requested, it would have been given and called into question the very heart of the government's case, i.e. its…informants."  *Id.* at 43.

The government counters: "Contrary to Moore's assertion otherwise, the court did instruct the jury as to how to consider testimony from such witnesses."  Opposition at 53.

The transcript of the trial court proceedings for April 17, 2007 shows, at 24:14–26:8, that Judge Davis instructed the jury as follows:

> You have heard from a number of types of witnesses.  There's been testimony from government witnesses who have pled guilty after entering into an agreement with the government to testify.
>
> There's been testimony from witnesses who were admitted or alleged accomplices in some of the crimes charged in the indictment.
>
> There have been witnesses who testified under a grant of immunity from the federal government whereby their testimony will not be used against them in any criminal case.
>
> I instruct you that there is nothing improper in the government's use of these types of witnesses.  And the government is permitted to enter into the type of plea or immunity agreements you have seen in this case.
>
> The government may argue, as it is permitted to do, that it must take the witnesses as it finds them.  It may argue that the people who themselves take part in criminal activity have the knowledge required to show criminal behavior by others.
>
> The defense may dispute these contentions.  You in turn may accept the testimony of these witnesses and convict the defendant on the basis of the witness's testimony alone if it convinces you of the defendant's guilt beyond a reasonable doubt.

> *However, it is also the case that testimony from witnesses of the type I have described here must be examined with caution and weighed with great care.*

I have given you some general considerations on credibility, and I will not repeat them all here.  However, let me say a few things that you should consider during your deliberations with respect to these witnesses.

You should ask yourselves whether these witnesses would benefit more by lying or by telling the truth?

Was their testimony made up in any way because they believed or hoped that they would somehow receive favorable treatment by testifying falsely?

Or did they believe that their interest would be best served by testifying truthfully?

If you believe that the witness was motivated by hopes of personal gain, was the motivation one which would cause him or her to lie?  Or was it one which could cause him or her to tell the truth?

Did this motivation color his or her testimony?

In sum, you should look at all of the evidence in deciding what credence and what weight, if any, you will want to give to these witnesses.   (Emphasis added).

In his Reply, at 14-15, Moore compares Judge Davis's instructions to those determined to be insufficient in *United States v. Luck*, 611 F.3d 183 (4th Cir. 2010).  Moore's assessment is simply wrong.  In *Luck*, *id.* at 189-90, the Fourth Circuit deemed the trial court's instruction a mere "general credibility" instruction, and determined that a more specific "informant instruction" was warranted.  The instructions at issue in *Luck*, *id.* at 189, are reproduced below, and clearly are not comparable to those delivered by Judge Davis in the case at bar.[14]  Further, in

---

[15] You are the sole judges of credibility or believability of each witness and the weight to be given the witness's testimony.  In weighing the testimony of a witness, you should consider his relationship to the government or to the defendant; his or her interest, if any, in the outcome of the case....

Therefore, whatever punishment...another defendant may or may not have— there's no other defendant in here.  We're talking about any other conspirator in this

*Luck*, *id.* at 190, the Court noted that, "had the informant instruction been given, there is a reasonable probability that the outcome of the proceeding would have been different," because "[t]he government's case was built entirely on a foundation of paid informant testimony," and "[t]here was minimal physical evidence." The same cannot be said of this case.

In sum, there is no merit to Moore's contention that his attorney's performance was deficient because he did not request a jury instruction about the heightened scrutiny to be given to the testimony of witnesses cooperating with the government; it cannot serve as the basis for relief under § 2255.

VIII.   Insufficiency Of The Evidence

Moore complains that his defense attorney did not argue improper venue with respect to "at least Counts Three and Four," involving the two shooting deaths in North Carolina. Moore Memo at 43. In particular, he asserts that his attorney's performance was deficient because he did not "argu[e] to the jury that the government had failed to prove one of the essential elements charged, i.e., that the offense(s) occurred in the district where the jury is sitting." *Id.*

The government observes that the fact that "the firearm use occurred in North Carolina was never in dispute," and concludes that "any 'failure' to argue that point could not be error." Opposition at 54. Further, the government argues that, "for counsel to have argued that the jury should not convict because the firearm use occurred in North Carolina [would] have been

---

case—may or may not have received in the past or any punishment that he or she may or may not receive in the future should not enter into your deliberations unless you feel the witness is somehow motivated to make the statements they did on the stand in an effort to help them.

Of course, this does not prevent you from considering the motivation or credibility of a particular witness who may have chosen to testify in hopes of receiving a lighter or reduced sentence. However, while you should carefully consider the motivation and credibility of each witness, the specific punishment he or she may or may not receive is a matter strictly for the court.

improper and contrary to the law," and, as such, "[a]ny 'failure' to make such an argument could therefore not be error." *Id.* at 55.

As discussed, *supra,* at 21, the law is clear that Moore and Babb could be prosecuted in Maryland for conspiracy, so long as the jury found that at least one overt act was committed in Maryland in furtherance of the drug trafficking conspiracy.  And, they could be convicted of Counts Three and Four if the jury found that the firearm use was in furtherance of the underlying conspiracy charged in Count One.  Plainly, defense counsel did not err and there is no basis for relief.

IX.    Mistrial

Moore argues that his attorney's performance was deficient in that he did not "immediately mov[e] to voir dire the jury and for a mistrial," Moore Memo at 44, after the trial judge made the following statement:[15]

> Counsel, there have been some regular attendees at this trial who I take it are family members, acquaintances of one or both of the Defendants.  It would appear that perhaps jurors believe too much attention is being paid to them….Obviously, it's not unusual for participants in a trial to watch the jury, but we want to be sure that the jury is not made uncomfortable.

> …I would appreciate counsel commenting to them when and as appropriate that we don't want to make the jurors uncomfortable, and what's actually a lot more interesting about a trial is what goes on in the well of the court and from the witness stand as opposed to the jury.  So I share that with you just so that you can convey the court's mild concern that the jurors not be made uncomfortable.  It's nothing more than that.  Okay?

In Moore's view, Judge Davis's remarks made "clear" that "members of the jury had conveyed to the Court that they felt threatened and/or intimidated," Moore Memo at 44, and that

---

[15] Only a short excerpt of Judge Davis's remarks is included in the Moore Memo.  A fuller version of Judge Davis's remarks is included in the Opposition, at 57, and is set forth here for completeness.  Judge Davis's remarks are also reproduced in full in the Fourth Circuit's opinion on direct appeal.  *See Babb, supra*, 369 F. App'x at 511.

"some person or persons attending trial had directly or indirectly attempted to influence the jury." *Id.* at 45. He also insists that "the persons referred to by the Court were actually members of the victims' families who made clear that they expected the jury to convict." *Id.* n. 8. In Moore's view, his attorney's failure to demand a mistrial evinces ineffective assistance of counsel.

The government counters:

[T]he Court of Appeals has already found, pursuant to plain error review, that there was no basis to conclude that improper jury contact occurred. Therefore, the district court did not err by not conducting a *voir dire*. The Court of Appeals also held that not conducting a *voir dire* (much less not declaring a mistrial) did not prejudice Moore. It follows that if the circumstances were such that the district court was not even required to conduct an individual *voir dire,* then a motion for mistrial was not warranted and, if made, could not have succeeded.[]

Opposition at 58 (internal citation omitted).

In its opinion on direct appeal, the Fourth Circuit observed: "In order to prevail under plain error review, a petitioner must demonstrate that: (1) an error occurred; (2) the error was plain; and (3) the error affected his substantial rights." *Babb*, 369 F. App'x at 510 (citing *United States v. Olano,* 507 U.S. 725, 732 (1993)). For an error to have affected a petitioner's substantial rights, "the error must have been prejudicial: It must have affected the outcome of the district court proceedings." *Olano*, 507 U.S. at 734. The Fourth Circuit determined that Moore "ha[d] certainly not carried his burden of showing that the jury was improperly influenced, much less that the influence was so serious that it required individual voir dire by the judge." *Babb*, 369 F. App'x at 511. It concluded that, even if a voir dire had been conducted, the outcome of the proceedings would not have been different. Therefore, Moore's attorney did not err in failing to request a voir dire or to move for a mistrial.

X.      Double Jeopardy

Moore argues that his attorney's performance was deficient in that he did not "argue multiplicity."   Moore Memo at 48.   In particular, he complains that "the imposition of consecutive sentences for the § 924(c) convictions violated [his] right to be free from double jeopardy…." *Id*.   Further, Moore maintains that his convictions on Counts Two, Three, Four, and Seven "arose from the same predicate offense, i.e., Count One," *id*. at 46, and, consequently, his "sentence must be corrected to reflect one § 924(c) conviction, or [have] the remaining sentences [run] concurrently." *Id*. at 48.

The government vigorously disagrees.   It asserts: "The law of this circuit is that the separate instances of use or possession permit separate, non-concurrent sentences, even if the separate Section 924(c) counts are all predicated on the same crime of violence or drug trafficking."   Opposition at 60.

In *United States v. Camps,* 32 F.3d 102 (4th Cir. 1994), the Fourth Circuit addressed the question of whether multiple consecutive sentences could be imposed under § 924(c)(1) if those convictions arose out of the events of a single predicate offense.   In that case, as in the case at bar, the predicate offense was a drug conspiracy.   The Court held that multiple consecutive sentences *could* be imposed, without implicating double jeopardy concerns, "whenever there have been multiple, separate acts of firearm use or carriage, even when all of those acts relate to a single predicate offense." *Id*. at 106.   That view was recently reiterated in *United States v. Lighty*, 616 F.3d 321, 371 (4th Cir. 2010), in which the Court said: "[M]ultiple, consecutive sentences under § 924(c)(1) are appropriate whenever there have been multiple, separate acts of firearm use or carriage, even when all of those acts relate to a single predicate offense."

Moore's sentence did not trigger double jeopardy concerns. It follows that his attorney was not deficient in failing to make such a claim.

XI.   Misapplication Of The Sentencing Guidelines

Moore challenges the life sentence imposed upon him with respect to Count One, asserting that it was "based entirely on the cross reference from the [United States Sentencing] [G]uidelines for Count 1 (i.e., [U.S.S.G.] § 2D1.1[(d)(1))] to the guidelines for premeditated murder found in [U.S.S.G.] § 2A1.1." Moore Memo at 48. In Moore's view, the cross reference was inappropriate because "[t]he jury was not asked to consider whether [he] murdered anyone, either with or without premeditation." *Id.* at 49. Moore claims the jury was asked to consider only whether he was "an aider and abettor." *Id.* at 51. Insisting that his attorney was ineffective in not correcting the government's "misrepresentations to the Court during sentencing" that the jury had "found Mr. Moore guilty of premeditated murder," *id.* at 50,[16] Moore urges the Court to correct his sentence for Count One to reflect the guidelines without the cross reference, *i.e.*, "a sentence of 10 years." *Id.* at 52.[17]

The government responds: "Despite Moore's assertion to the contrary, the jury was not required to make a specific finding of 'premeditation' in conjunction with the 'killings' related to the drug trafficking conspiracy." Opposition at 63 (citation omitted). It disputes that the cross reference to § 2A1.1 applies only to premeditated murders, insisting that § 2A1.1's plain language refers to murders generally, not just premeditated murders. *Id.* at 64. The government asserts: "Section 2D1.1 triggers the base offense level...found in Section 2A1.1 whenever 'a

---

[16] It is unclear to which "misrepresentations" Moore refers.

[17] Assuming Moore did not have prior convictions for felony drug offenses, the mandatory minimum for Count One was ten years; the statutory maximum was life in prison. *See* 21 U.S.C. § 841(b)(1)(A). Moore's prior convictions are not addressed in the briefs, and are not relevant to the disposition of this claim.

victim is *killed* under circumstances that would constitute *murder* under 18 U.S.C. § 1111'…which defines both first *and* second degree murder." *Id.* (emphasis in original) (quoting U.S.S.G. § 2A1.1).[18]

In addition, the government argues that the sentence was lawful, and therefore defendant's claims are without merit. It asserts, Opposition at 63:

> Since Moore was convicted of Count One, he was subject to any sentence, up to the statutory maximum of life imprisonment, that the court chose to impose within the lawful exercise of its discretion. As long as the Court's sentence was within the maximum statutory sentence, the findings upon which the court made its sentencing did not implicate the 6th Amendment and did not require any special findings *by the jury* beyond the drug quantity findings they recorded on the special verdict form.

To be sure, Judge Davis's sentence of life imprisonment was a legal sentence, because Count I (conspiracy) carried a statutory maximum of life, even without any enhancements for murder. *See* 21 U.S.C. § 841(b)(1)(A). But, that conclusion does not necessarily resolve the issue, because Judge Davis might not have imposed a life sentence, but for the two homicides.

It is clear that the jury found Moore culpable for the killings of Robinson and Withers. First, Counts Three and Four of the Third Superseding Indictment charged that Moore (and Babb) "did knowingly use, carry, and discharge a firearm" against Robinson and Withers, respectively, "during and in relation to a drug trafficking crime for which they may be prosecuted in a court of the United States, to wit: Conspiracy to Distribute Narcotics, as set forth in Count One of this Third Superseding Indictment…." In its jury instructions, the trial judge read Counts Three and Four to the jury. *See* Transcript of April 17, 2007, 56:2-22. The Verdict

---

[18] In my view, the government is not fully responsive to Moore's contention. Moore complains that the jury was never asked to determine whether he killed anyone, yet he was punished for having committed murder. Therefore, the government's focus on premeditation misses the point. Moreover, the issue is not simply whether the sentence fell within the statutory maximum, as the government seems to suggest. Defendant claims that, but for Judge Davis's consideration of the homicides, he might not have imposed the statutory maximum.

Sheet clearly shows that the jury found Moore guilty of Count Three, which is defined on the Verdict Sheet as the offense of "Using and Carrying a firearm during and in relation to a drug trafficking crime, as to Willie Robinson," and Count Four, which is defined identically to Count Three, except that it named Alexandra Withers as the victim.

Second, both defendants were convicted of Count One of the Third Superseding Indictment, charging conspiracy. Count One contained a section titled "Overt Acts Committed In The District Of Maryland." In its jury instructions, the Court read Count One to the jury, including the portion pertaining to the overt acts. *See* Transcript of April 17, 2007, 34:7-39:6. That portion included several averments about the deaths of Robinson and Withers, such as the following:

> d. On November 6, 2003, JAMES MOORE operated the stolen motor vehicle of Willie Robinson in the District of Maryland;

> ***

> f. On November 6, 2003, JAMES MOORE operated a motor vehicle in the District of Maryland in which he transported, in the trunk of that vehicle, the deceased bodies of Willie Robinson and Alexandria Withers for the purpose taking [sic] the bodies to New York for disposal and to conceal his involvement and that of his coconspirators in the murders of Robinson and Withers;

> g. On November 6, 2003, in a motor vehicle which he operated in the District of Maryland, JAMES MOORE possessed $100,380 in U.S. Currency which had been taken from the victims Willie Robinson and Alexandria Withers, and which was being transported in a green knapsack carried within the passenger compartment of the vehicle;

> h. On November 6, 2003, JAMES MOORE, while in the District of Maryland, possessed on his person over $2000 in cash that was taken from the victims Robinson and Withers;

> I. On November 6, 2003, JAMES MOORE possessed and transported in and through the District of Maryland evidence of the murders of Willie Robinson and Alexandria Withers, to include the bloody clothing of the victims and 9mm shell casings and projectiles from a Glock 9mm firearm that was used to murder the victims and which evidence was being transported to New York to conceal the

involvement of JAMES MOORE and other members of the conspiracy in the murders;

     j. On November 6, 2003, JAMES MOORE, possessed two cans of gasoline in the passenger compartment of a motor vehicle he was operating in the District of Maryland, which gasoline was intended to conceal the involvement of JAMES MOORE and other members of the conspiracy in the murders of Willie Robinson and Alexandria Withers by abandoning and burning the vehicle and its contents in New York. . . .

With respect to Moore's assertion that the jury was to consider only whether he was "an aider and abettor," Moore Memo at 51, not whether he had committed a murder, Judge Davis instructed: "With respect to the use of firearms charged herein, each defendant is charged with aiding and abetting the other defendant." *See* Transcript of April 17, 2007, 57:22-24.  He added: "It may be impossible [for the jury] to determine who personally used firearms." *Id.* at 57:24-25. Further, Judge Davis instructed the jury: "The aiding and abetting statute, Section 2 A of Title 18 of the United States Code provides that 'whoever commits an offense against the United States or aids and abets, or counsels, commands, or induces or procures its commission, is punishable as a principle [sic]." *Id.* at 57:25-58:4.  Judge Davis continued, *id.* at 58:12-17:

     [Y]ou may find the defendant guilty of the offense charged if you find beyond a reasonable doubt that the government has proved that another person actually committed the offense with which the defendant is charged, and that the defendant aided or abetted that person in the commission of the offense.

In addition, Judge Davis thought Moore was culpable for the homicides.  At sentencing, Judge Davis characterized the two murders as "cold-blooded and inexcusable unjustified act[s] of malice." *See* Transcript of July 24, 2007, at 7:11-13.  Notably, in deciding whether to impose the statutory maximum of life imprisonment for Count I, Judge Davis was entitled to consider the homicides.  "Sentencing judges may find facts relevant to determining a Guidelines range by a preponderance of the evidence, so long as the Guidelines sentence is treated as advisory and falls within the statutory maximum authorized by the jury's verdict." *United States v. Benkahla*,

530 F.3d 300, 312 (4th Cir. 2008).  *See also United States v. Martinez*, 136 F.3d 972, 979 (4th

Cir. 1998) (holding that even "an acquittal on particular counts…does not prevent the district

court from using those offenses in computing the applicable sentencing guidelines.").

Accordingly, the trial court was entitled to apply the cross reference for murder.  With

respect to the calculation of the Guidelines, U.S.S.G. § 2D1.1(d)(1), which applies to convictions

for "Unlawful Manufacturing, Importing, Exporting, or Trafficking (Including Possession with

Intent to Commit These Offenses); Attempt or Conspiracy," states:

> If a victim was killed under circumstances that would constitute murder under 18
> U.S.C. § 1111 had such killing taken place within the territorial or maritime
> jurisdiction of the United States, apply §2A1.1 (First Degree Murder) or §2A1.2
> (Second Degree Murder), as appropriate, if the resulting offense level is greater
> than that determined under this guideline.

*United States v. Hatten*, No. 06-4240, 2007 WL 1977663, *2 (4th Cir. July 05, 2007), an

unpublished, per curiam opinion, provides guidance.  There, the Court explained:

> § 2D1.1 expressly directs the application of the § 2A1.1 first degree murder
> provision if the killing "constitute[s] murder," without distinguishing between
> murder in the first and second degree.  [T]he plain meaning of § 2D1.1(d)(1)
> indicates that the murder cross reference to § 2A1.1 applies if there is any murder
> as defined by § 1111-not just murder in the first degree.

Section 2A1.1 "applies in cases of premeditated killing."  *See* U.S.S.G. § 2A1.1.  But,

Section 2A1.1 also applies, *id.*,

> when death results from the commission of certain felonies.  For example, this
> guideline may be applied as a result of a cross reference (e.g., a kidnapping in
> which death occurs, see §2A4.1(c)(1)), or in cases in which the offense level of a
> guideline is calculated using the underlying crime (e.g., murder in aid of
> racketeering, see §2E1.3(a)(2)).

With respect to penalties, Section 2A1.1 provides for a Base Offense Level of 43 and

provides:

> In the case of premeditated killing, life imprisonment is the appropriate sentence
> if a sentence of death is not imposed. A downward departure would not be

appropriate in such a case.  A downward departure from a mandatory statutory term of life imprisonment is permissible only in cases in which the government files a motion for a downward departure for the defendant's substantial assistance, as provided in 18 U.S.C. § 3553(e).[19]

In *United States v. Gibson*, 328 F. App'x 860, 864-65 (4th Cir. 2009), *cert. denied* 130 S.Ct. 1283 (2010), the Court determined that the trial judge did not err in applying the first degree murder cross reference under U.S.S.G. § 2D1.1(d)(1), even though the petitioner was not indicted for the murder at issue, because the district court found by a preponderance of the evidence that the defendant had ordered the murder.  In *United States v. Patterson*, 200 F. App'x 173, 175 (4th Cir. 2006), *cert. denied* 127 S.Ct. 519 (2006), the Court found no error in the application of the first degree murder cross reference, even though the petitioner argued that "the jury's verdict acquitting him of the firearm conspiracy charge equates with the jury's rejection of the evidence that he participated in the home invasion that resulted in the victim's death."  The Court stated that "[t]his is not necessarily the case," and that "even if the jury did reject the evidence concerning Patterson's participation in the home invasion, we have previously held that a sentencing court may enhance a defendant's sentence based on its findings of conduct by a preponderance of the evidence, even if the jury acquitted the defendant of that conduct."  *Id.*

Further, Moore raised this issue in his direct appeal to the Fourth Circuit, and the contention was resolved in favor of the government.  The Court said, *Babb*, 369 F.App'x at 504 n.1:

> James Moore sought, and we granted, permission to file a pro se supplemental brief after this case was calendared for oral argument.  In it he raises arguments concerning…failure to indict on conduct used as other acts evidence at sentencing.  Because settled circuit precedent controls on these issues, see…*United States v. Grubbs*, 585 F.3d 793, 798-99 (4th Cir.2009) (citing *United States v. Watts*, 519 U.S. 148, 157, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997)) (holding that uncharged conduct may be considered at sentencing when that

---

[19] It is not alleged that Moore provided substantial assistance.

conduct is proven by a preponderance of the evidence) respectively, we decline to address the[] issue[] further and find the district court did not err….

For all of these reasons, I conclude that Judge Davis did not err by imposing a life sentence as to Count One.

## XII.   Impermissible Double Counting

Moore asserts "that the Court imposed an enhancement under [U.S.S.G.] § 2A1.1 for Count One based on the same identical conduct charged in Counts 2, 3, 4, and 7, and for which Mr. Moore received consecutive sentences." Moore Memo at 54.  In particular, he complains that he was punished for Counts 2, 3, 4, and 7, charging "use and/or possession of a firearm during the drug trafficking crime in Count One," and therefore he should not have received an enhanced sentence for Count I, based on the use of the firearms. *Id.* at 53.  Moore insists that this amounts to "impermissible double counting." *Id.*

Moore concedes that "the sentence imposed for Count One may have been within the statutory maximum for that offense," that "the Guidelines are merely advisory," and that "the Court can take into account other conduct in determining an appropriate sentence. *Id.* at 54-55. But, he argues that the trial court impermissibly "use[d] conduct Mr. Moore was already being punished for to determine his sentence for Count One." *Id.* at 55.  Claiming that "counsel's failure to raise this argument at sentencing and on appeal was grossly deficient performance," *id.,* Moore asserts: "Had counsel done so, there is at least a reasonable probability that the argument would have been sustained and [his] sentence significantly reduced." *Id.*

The government counters that "the guidelines for Count One were *not* enhanced for use or possession of a firearm."  Opposition at 66 (emphasis in original).  It posits, *id.*:

A two level [increase] for weapon possession can be applied pursuant to Section 2D1.1(b)(1), but was not applied to Moore.  Instead, as discussed, the court applied Section 2D1.1(d) (the murder cross-reference).  The murder cross-

reference was not applied due to Moore's use or possession of a firearm.  It was applied for the *killings* of Willie Robinson and Alexandria Withers.

In *United States v. Wilkerson*, 173 F.3d 427 (4th Cir. 1999), *cert. denied* 120 S.Ct. 321 (1999), an unpublished, per curiam opinion, petitioner advanced a contention almost identical to Moore's, which was rejected by the Fourth Circuit.  There, the petitioner argued that "the application of the cross-reference to the first-degree murder guideline resulted in impermissible double counting…because the murder used to enhance his sentence on the conspiracy count also was the basis for his § 924(c) conviction…." *Id.*  The Court concluded, *id.*:

> Although the same underlying facts surrounding [the] murder were used to enhance [petitioner's] sentence by applying the cross-reference and to impose a consecutive sentence on the § 924(c) offense, the triggering event for each application is different. For the cross-reference, the triggering event was the murder; for the consecutive sentence under § 924(c), the triggering event was the fact that [petitioner] used or carried the firearm. Because the cross-reference and the consecutive sentence address separate and distinct acts, we find that application of both was not contrary to the guidelines' intent.

Here, Moore concedes that Count One was enhanced pursuant to the cross reference, as discussed in the preceding section.  The enhancements related to the deaths of Robinson and Withers are distinct from the enhancements related to the "use and/or possession of a firearm."  There was no double counting, no attorney error, and no prejudice to Moore.

*Babb*

I.    Multiple Conspiracy Instruction

Claiming that the events described earlier comprised "four distinct conspiracies," rather than just one, Babb argues that his attorney's performance was deficient because he did not "request a jury instruction on multiple conspiracies."  Babb Memo at 1-2.[20]  He insists that each criminal conspiracy "had differing goals that changed wiht [sic] the circumstances," and that

---

[20] Babb does not clearly delineate the four separate conspiracies.

"[t]he evidence adduced at trial simply failed to demonstrate that the defendant's [sic] shared a 'single-mindedness to achieve a particular goal,'"[21] as would be necessary to find a conspiracy. *Id.* at 3.  According to Babb, his attorney's failure to secure a "multiple conspiracy instruction" was prejudicial and "denied him a fair trial" because, if all the criminal acts were considered part of one conspiracy, the jury could "consider other defendant's brutality as evidence against [Babb]." *Id.*

The government observes that "Babb's first claim, that the district court should have given a multiple conspiracy instruction has already been raised, considered and rejected on appeal." Opposition at 66.  Thus, it insists that "[t]he issue has been resolved against Babb and Moore." *Id.*  The government is correct.

On direct appeal, the Fourth Circuit considered the defendants' complaint that "the district court erred in failing to give a multiple conspiracies instruction when they requested it," because petitioners contended that "there was no overarching conspiracy between them, just individual drug conspiracies, and even if they did conspire together, the evidence supports a finding that the conspiracy began in October 2003, and not earlier as charged." *Babb*, 369 F. App'x at 507.  It concluded that "sufficient evidence exists to demonstrate that [petitioners'] drug trafficking activities were related and, thus a multiple conspiracies instruction was not warranted." *Id.*  Having examined the evidence of a continuing conspiracy implicating Moore and Babb, the Court continued, *id.* at 508:

> Moore and Babb…cannot demonstrate that the jury would have acquitted as to the conspiracy count if they had been given the cautionary multiple conspiracies instruction, and we find no prejudice to the defendants and hold that the district court did not abuse its discretion denying such an instruction.

---

[21] It is unclear what authority Babb is quoting, as he does not include a citation.

In my view, the issue has been resolved, and further examination would be fruitless. Babb can show no entitlement to a multiple conspiracy instruction, nor prejudice related to its omission.  In sum, the trial court's failure to give such an instruction cannot serve as a viable ground for Babb to attack his conviction.

II.    Improper Consideration Of Prior Convictions

Section 851 of Title 21 of the United States Code is relevant.  It provides that "the court shall after conviction but before pronouncement of sentence inquire of the [defendant] whether he affirms or denies that he has been previously convicted as alleged in the information, and shall inform him that any challenge to a prior conviction which is not made before sentence is imposed may not thereafter be raised to attack the sentence."

Babb argues that his defense attorney's performance was deficient because Babb was not afforded an adequate "opportunity to challenge [his] prior convictions," which enhanced the penalties that could be imposed upon Babb, and may have led to the mandatory life sentence imposed on him.  Babb Memo at 3-4.  Specifically, Babb complains that the government relied on "computer printouts" from the "National Crime Information Center Computer [('NCIC')] System," instead of "certified records of [Babb's] criminal history," without a challenge from Babb's lawyer.  *Id.*  And, Babb complains that the trial court did not "engage Petitioner in the mandatory colloquy regarding his right to challenge his prior convictions."  *Id.* at 5.  Notably, however, Babb does not dispute the validity of the convictions used to enhance his sentence.

The government argues that, when "'it is clear from the circumstances that the defendant does not contest the validity of his prior convictions,'" strict compliance with the correct procedure for the introduction of prior convictions "'is not necessary.'"  Opposition at 68 (quoting *United States v. Hagler,* 371 F. App'x 423, 427 (4th Cir. 2010)).  Noting that "Babb had

40

every opportunity to challenge his convictions," the government asserts that "he explicitly chose not to do so, obviously because his attorneys were satisfied that they could be easily proven." Opposition at 68.

As indicated, Babb has not identified a disputed prior conviction.  Strict compliance with the dictates of enhanced sentencing provisions based on prior convictions is unnecessary when, as here, the defendant's prior convictions are not seriously in dispute.  In *United States v. Ellis*, 326 F.3d 593, 599 (4th Cir. 2003), for example, the Fourth Circuit affirmed the defendant's conviction because it was "clear that even if the district court had conducted the colloquy [required by 21 U.S.C. § 851]…neither Ellis nor his attorney would have challenged Ellis' prior convictions."  *See, e.g., Hagler,* 371 F. App'x at 427 (finding unavailing Hagler's challenge of his conviction on the ground that the government failed to comply strictly with 21 U.S.C. § 851, because Hagler "d[id] not explain why the use of his prior conviction was improper; he argue[d] only that the court did not utilize the appropriate procedures.").

Babb's argument regarding the NCIC printouts is equally unpersuasive.  He does not allege an actual error.  Instead, he complains that the proper procedure was not followed.  This cannot serve as a basis on which to attack his sentence, however.  *See United States v. Moffitt*, 337 F. App'x 280, 282 (4th Cir. 2009) (addressing the use of NCIC data at sentencing, as appellant claimed that "the evidence before the district court was not sufficiently reliable to support its conclusion that the firearm he possessed was stolen," which was the basis for a sentence enhancement applied against him, and holding that, "[b]ecause Moffitt's assertions that the information was not sufficiently reliable are based on conjecture," the district court "properly overruled his objection to th[e resulting] enhancement.").

It is also noteworthy that copies of certified records of Babb's convictions were made part of the record. They were appended to the "Information/Notice Of Government's Intention To Seek Minimum Mandatory Sentence And Enhanced Minimum Mandatory And Maximum Sentences," submitted September 8, 2006, and are not inconsistent with the information purportedly contained in the NCIC printouts.

### III.   Cruel And Unusual Punishment

Because of Babb's prior record and the drug quantity in issue, Babb received a mandatory life sentence on Count I, the drug conspiracy. *See* 21 U.S.C. § 841(b)(1)(A); *see also* § VI, *infra*. Babb insists that the life sentence imposed upon him constituted "cruel and unusual punishment in violation of the Eighth Amendment," because his "two alleged prior predicate felonies were non-violent, minor drug offenses," and because the court could not consider "mitigating factors at sentencing." Babb Memo at 6.[22] The government counters: "The Fourth Circuit [has] held already that 'a mandatory sentence of life imprisonment without release, as applied to a repeat drug offender, d[oes] not fun afoul of the Eighth Amendment's prohibition against cruel and unusual punishment.'" Opposition at 69-70 (quoting *United States v. Wheeler*, 317 F. App'x 298, 300 (4th Cir. 2008)).

In *United States v. Kratsas,* 45 F.3d 63, 68-69 (4th Cir.1995), the Fourth Circuit held that "a mandatory sentence of life imprisonment without release, as applied to a repeat drug offender…is not disproportionate to the offense committed," and that "the mandatory nature of the sentence does not thereby render the sentence unconstitutional." Therefore, Babb cannot obtain relief on the ground that his sentence was "cruel and unusual."

---

[22] Babb identifies several "mitigating factors," including that he was "raised by his biological mother's sister and her family," among whom there was substance abuse; that he is unmarried, but has four children; that he "dropped out of school" and has "no stable employment history"; and that he "used alcohol, cocaine and marijuana at a very young age." *Id.*

IV.      Reasonable Doubt Instruction

Like Moore, Babb argues that his attorney's performance was deficient because he failed to secure a jury instruction regarding "reasonable doubt," although Babb acknowledges that his attorney did request such an instruction.  Babb Memo at 7.  Babb asserts: "Stating that it felt confined by the law of the [F]ourth [C]ircuit, the District Court refused the request."  *Id.*  Babb recognizes that the Fourth Circuit "has held that it is improper to instruct a jury as to the standard of reasonable doubt," but argues that the Fourth Circuit should change its stance, as "the concept of reasonable doubt is at the foundation of our criminal justice system and a definition of it to the jury is necessary to protect the due process rights of the criminally accused."  *Id.*

In response, the government briefly reiterates the arguments it made regarding the reasonable doubt instruction with respect to Moore.  Opposition at 70.

I shall do the same.  As discussed, Fourth Circuit precedent dictates against a requirement for a trial judge to propound a reasonable doubt instruction.  Babb's argument that his conviction was improper due to the lack of a reasonable doubt instruction must fail.

V.       Misapplication Of The Sentencing Guidelines

Also like Moore, Babb argues that the life sentence imposed upon him for Count One[23] is unconstitutional because of the improper cross reference to U.S.S.G. § 2A1.1.  Babb Memo at 8.  He insists that the imposition of a life sentence was erroneous because there was no jury finding that he was responsible for a murder.  *Id.* at 10-12.

In addition, Babb argues that the sentence was improper because it was based upon a finding that the conspiracy in which he participated involved "50 grams or more" of cocaine

---

[23] As noted, Count One charged Moore and Babb with conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine and fifty grams or more of cocaine base, in violation of 21 U.S.C. § 846.

base. *Id.* at 9. He contends the jury should have been instructed to determine the "amount of drugs attributable to [Babb]" specifically, rather than sentencing him pursuant to the "amount of drugs" attributable to the conspiracy as a whole. *Id.* at 9-10. Therefore, Babb urges the Court to "vacate and remand for re-sentencing under…[the] provision[s] applicable [to an] amount of cocaine base…less than 5 grams," or, alternatively, that the Court "remand for a new trial." *Id.* at 10.

The government posits that, "contrary to Babb's assertion otherwise, the jury *was* instructed that it must make individual assessments of the type and quantity of drugs attributable to each defendant," and properly did so. Opposition at 70 (emphasis added). And, it maintains that Babb's life sentence was properly based on the drug quantities found attributable to him, *i.e.* five kilograms or more of cocaine and fifty grams or more of crack cocaine, as well as the cross reference at U.S.S.G. § 2D1.1(d), discussed previously, both of which triggered a maximum penalty of life imprisonment. *Id.* at 71. And, in any event, Babb faced a mandatory life sentence, pursuant to the sentencing enhancement triggered by Babb's prior convictions. *Id.*

The trial transcript for April 17, 2007, at 49:1-50:8, shows that Judge Davis instructed the jury as follows:

> If you find that the government has proven the defendant guilty of the conspiracy charged in count 1; that is, the alleged conspiracy existed, and that the defendant knowingly and intentionally became a member of the conspiracy, then you must determine beyond a reasonable doubt what type and quantity of the controlled substances are attributable to the defendant.

> In determining what type and quantity of controlled substance is attributable to a particular defendant, you should consider the following factors:

> First, a defendant is accountable for the type and quantity of drugs which he personally distributed or possessed with intent to distribute.

> Second, a defendant is also accountable for any type and quantity of drugs which he attempted to, or planned to distribute or possess with intent to distribute.

***

Third, a defendant is also accountable for any type and quantity of drugs, which another member of the conspiracy distributed or possessed with the intent to distribute as part of the conspiracy, so long as it was reasonably foreseeable to the defendant that such a type and quantity of drugs would be involved in the conspiracy which he joined.

Fourth, a defendant is also accountable for any type and quantity of drugs which another member of the conspiracy attempted to or planned to distribute, or possessed with intent to distribute so long as it was reasonably foreseeable to the defendant that such a type and quantity of drugs would be involved in the conspiracy, which he joined.

Judge Davis's instructions were correct in every respect. Although Babb may wish it were otherwise, "[a] conspirator may be held accountable for all quantities of drugs attributable to the conspiracy so long as it was reasonably foreseeable that the drugs would be involved in the conspiracy and that the drugs were possessed within the scope of the conspiratorial agreement." *United States v. Osborne*, 345 F.3d 281, 284 (4th Cir. 2003). The jury was informed of this principle, and of the need to assess Babb's culpability individually. It did so, as illustrated by the Verdict Sheet, appended by the government as "Attachment 4."

The Verdict Sheet allowed the jury to enter a verdict of "Not Guilty" or "Guilty" as to Babb for Count 1 and, if it entered a verdict of "Guilty," it was required to "indicate which controlled substances were involved," and in what quantities. The jury found that Babb had conspired to distribute and possess with intent to distribute both cocaine and crack cocaine. As to quantities, it found "Five kilograms or more" of cocaine, and "50 grams or more" of crack cocaine. Although the verdict for Babb on Count I was identical to that for Moore, the Verdict Sheet required the jury to make separate findings for each defendant.

With respect to Babb's argument as to the imposition of the life sentence, Judge Davis applied the cross reference at U.S.S.G. § 2D1.1(d), although the jury did not reach a verdict as to

Counts Three and Four with respect to Babb.[24]   At sentencing, Babb's defense counsel stated: "I do object to the calculation of the base offense level based on the cross-reference.  It's not an argument, I just want to make sure that objection's noted in the record."  Transcript of July 24, 2007, at 6:14-16.  Judge Davis responded: "I do agree with the government that there are two avenues to a mandatory life sentence at federal offense level 43, and the Court, while noting Mr. Babb's objection to the cross-reference, I find the cross-reference is entirely appropriate."  *Id.* at 7:1-5.

I agree that, as to Babb, "there [we]re two avenues to a mandatory life sentence."  So, even if the court erred in applying the cross reference, a life sentence was nonetheless mandatory.  The jury's findings as to drug quantity permitted a maximum of life imprisonment and, because of the sentencing enhancement triggered by Babb's prior convictions, the Court had no discretion; it had to impose a mandatory life sentence.  *See* 28 U.S.C. § 841(b)(1)(A).  There simply was no error in the imposition of Babb's life sentence, and no basis for collaterally attacking its imposition.

## VI.  Violation Of The Fair Sentencing Act

Finally, Babb asserts that, with respect to Count One, his "sentence is violative of his Fifth Amendment constitutional right to due process of law because of Congress' recent changes

---

[24]   As discussed, *supra*, at 34-36, Judge Davis was entitled to consider Babb's involvement in the deaths of Robinson and Withers, despite the jury's failure to reach a verdict as to him on Counts Three and Four.  Babb was convicted of Count I, the conspiracy charge, and the killings were included as overt acts committed in furtherance of the drug conspiracy.  *See, e.g., U.S. v. Ramseur*, 378 F. App'x 260 (4th Cir. 2010) (Ramseur was convicted of participating in a drug conspiracy in violation of 18 U.S.C. § 846; the § 2D1.1 cross reference was found to have been properly applied because Ramseur was found to have participated in the commission of three murders in furtherance of the conspiracy, although he was not convicted of the murders).  Moreover, "[s]entencing judges may find facts relevant to determining a Guidelines range by a preponderance of the evidence, so long as the Guidelines sentence is treated as advisory and falls within the statutory maximum authorized by the jury's verdict."  *Benkahla*, 530 F.3d at 312.

regarding the sentencing disparity between crack cocaine and powder cocaine bases." Babb Memo at 15. He refers to the Fair Sentencing Act ("FSA") of 2010, which amended 21 U.S.C. § 841 to ameliorate disparities in penalties for offenses involving crack cocaine versus powder cocaine. Although Babb recognizes that "Congress did not expressly elect to make the change[s] in the FSA retroactive," Babb Memo at 15, he suggests that, "in the 'interest of justice' he should be resentenced, in order to 'restore fairness in federal cocaine sentencing policy.'" *Id.* at 16.

The government also notes that the FSA is not retroactive. Opposition at 71. But, it claims that, "even if the recently increased crack minimum threshold were applied to [Babb's] conviction for Count One, the maximum sentence…would still be life imprisonment because the jury found that the quantity of cocaine…attributable to Babb was five kilograms or more—which triggers a maximum sentence of life under Section 841(b)(1)(A)." *Id.* at 72.

The United States Sentencing Commission determined to extend the retroactivity of the FSA, effective November 1, 2011, a date shortly after Babb filed his Motion, and after the government filed its Opposition. "[I]n light of the Attorney General's revised view on the retroactivity of the FSA, as well as the development of case law on this point in other jurisdictions," the Fourth Circuit has remanded a number of cases for reconsideration, without articulating any new rules relating to retroactivity. *United States v. Weiters*, No. 10–5045, 2012 WL 185659, *1 (4th Cir. Jan. 24, 2012). *See, e.g., U.S. v. Pass*, No. 11–4829, 2012 WL 627150, *1 (4th Cir. Feb. 28, 2012) ("As the Government's current stance regarding the application of the FSA could result in the imposition of a guideline sentence rather than a statutory mandatory minimum sentence, we think it prudent that the district court reconsider Pass' sentence in light of that view."); *U.S. v. Adkins*, No. 11–7537, 2012 WL 540827, *1 (4th Cir. Feb. 21, 2012) ("It is…unclear from the current record whether Adkins is eligible for a sentence reduction pursuant

to the recently-amended Guidelines.[]  Because the record is insufficient to determine Adkins' eligibility for a sentence reduction, we remand with instructions for the district court to make additional findings as to the amount of crack cocaine attributable to Adkins and, based on that finding, determine anew whether Adkins can or should benefit from Amendment 750."); *U.S. v. Trapp*, No. 11–4354, 2012 WL 505999, *1 (4th Cir. Feb. 16, 2012) ("Turning to the joint motion to remand, we grant the parties' motion to vacate Trapp's sentence and remand to the district court to permit that court to determine whether Trapp may be resentenced in accordance with the FSA.  By this disposition, however, we indicate no view as to whether the FSA is retroactively applicable to a defendant, like Trapp, whose offense was committed prior to the August 3, 2010, effective date of the Act, but who was sentenced after that date, leaving that determination in the first instance to the district court.").

However, even if the FSA applied retroactively to Babb, the government is correct in noting that Babb would still face a life sentence.  Babb was convicted of conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine and fifty grams or more of cocaine base, in violation of 21 U.S.C. § 846, making him "subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." *See* 21 U.S.C. § 846.  Those penalties are detailed in 21 U.S.C. § 841(b)(1)(A), which was, with respect to the provisions regarding five kilograms or more of cocaine, unaltered by the FSA.  Put another way, the FSA does Babb no favors.  Then and now, the statutory maximum for the offense of conviction is a life sentence, and that sentence is mandatory for defendants like Babb with two or more prior felony drug convictions.  Babb cannot collaterally attack his sentence on the ground that the FSA rendered his sentence improper.

**Conclusion**

Moore and Babb have offered many potential grounds for overturning their convictions and sentences, but none are valid.   Accordingly, their petitions under 28 U.S.C. § 2255 are hereby denied.


Date:  April 10, 2012                              _____/s/_____
                                                   Ellen Lipton Hollander
                                                   United States District Judge